# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA SOUTHERN DIVISION

| | |
|---|---|
| **PROGRESSIVE SPECIALTY INSURANCE CO.,** ) ) ) | |
| **PLAINTIFF,** ) ) | |
| v. ) ) | **Case No.:** _____ |
| **PARKING ENFORCEMENT SYSTEMS, INC.** and **TERRY WHITE,** ) ) ) ) ) | |
| **DEFENDANTS.** ) | |

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff Progressive Specialty Insurance Co. ("Progressive") files this declaratory judgment to obtain a ruling on whether a suit Terry White ("White") filed against Progressive's insured, Parking Enforcement Systems, Inc. ("PES), is covered under a commercial insurance policy issued by Progressive to PES. In support thereof, Progressive states as follows:

1. Progressive is incorporated in the state of Ohio with its principal place of business in Ohio, and it is a citizen of Ohio.

2. PES is incorporated in the state of Alabama with its place of business in Alabama, and it is a citizen of Alabama.

3. White is an adult citizen of the state of Alabama.

4. Thus, this action is a controversy between a citizen of the state of Ohio on the one hand and citizens of the state of Alabama on the other hand, and is wholly between citizens of different states. As shown below, the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

## JURISDICTION

5. This Court has jurisdiction under 28 U.S.C. §§ 1332, 1367, and 2201 to render a declaratory judgment establishing the parties' rights under a contract of insurance.

6. The liability insurance coverage issue arises out of the underlying suit of *Terry White v. Parking Enforcement Systems, Inc., et al.*, which was filed in the Circuit Court of Jefferson County, Alabama, case number 01-CV-2024-900860 ("the underlying suit"). A true and correct copy of the Complaint is attached as Exhibit A.

7. The underlying suit alleges that on December 15, 2023, PES improperly towed White's vehicle from a pay-to-park lot in downtown Birmingham that was owned by CRC 2, LLC ("CRC"), another defendant in the underlying suit, and managed by the remaining underlying defendant, Robert L. Crook, Jr. ("Crook"). *See* Ex. A. White claims he, age seventy-one, and his wife came out of a Birmingham restaurant late at night after finishing dinner to find that his car was missing from the parking lot where he had paid the fee to park. *See id.* At first, he had no idea where his car was and, in the dark of night, had to find the location of the lot to which

his car had been towed. *See id.* White alleges he then was forced to obtain a ride to PES's tow lot and pay $166.40 to retrieve his vehicle. *See id.* His car was towed because he had transposed his license tag numbers when entering them into the app he used to electronically pay to park in the lot. *See id.* PES refused to turn over the vehicle to White, even though White had paid the parking fee, until White signed an electronic tablet with additional terms and conditions that he could not see and that were not explained to him. *See id.* White also alleges that the actions of PES violated Birmingham City Ordinances. *See id.* White asserts that PES, in conjunction with CRC and Crook, has had a business scheme or plan since 2018 to overcharge parking and towing fees; tow, store, and retain vehicles improperly; tow vehicles for innocent clerical mistakes; double charge on parking spaces; require payments late at night when vehicle owners are stranded; and violate city ordinances regulating their operations. *See id.* White claims numerous individuals have been similarly affected by these towing practices and purports to assert a class action on their behalf. *See id.*

8. PES notified Progressive of the underlying suit and requested coverage under PES's Progressive commercial policy. Progressive is defending PES under a reservation of rights.

9. Progressive, as a liability insurer, owes two duties to its insureds: the duty to defend and the duty to indemnify. Progressive's potential liability to PES for

the costs of defending and indemnifying PES in the putative class action are thus at issue and ripe for consideration.

10. White asserts monetary damages, including but not limited to, the $166.40 he had to pay to retrieve his car. *See* Ex. A.

11. Further, White seeks an unspecified amount of damages for mental anguish. *See* Ex. A. Being stranded at night without a car and not knowing where it was, having to locate it, arrange transportation to it, and then pay a fine and sign documents one is not allowed to read, is a distressing event. The Alabama Supreme Court has affirmed awards with substantial mental distress damages. *See, e.g.*, *Orkin Exterminating Co. v. Jeter*, 832 So. 2d 25 (Ala. 2001) (finding $200,000 in mental anguish damages appropriate); *New Plan Realty Trust v. Morgan*, 792 So. 2d 351 (Ala. 2000) (affirming $100,000 in compensatory damages where evidence showed mental anguish and only $46,679 in property damages); *Alabama Power Co. v. Murray*, 751 So. 2d 494, 500–01 (Ala. 1999) (affirming award of $132,005.36 for wife's mental anguish following house fire); *see also Delchamps v. Bryant*, 738 So. 2d 824 (Ala. 1999) (remitting mental distress award from $400,000 to $100,000 in malicious prosecution action where plaintiff had minor economic damages).

12. White also claims an unspecified amount of punitive damages. *See* Ex. A. Alabama has consistently recognized that a three-to-one ratio is reasonable and legally permissible. *Phillips v. Garrison Prop. & Cas.*, 2020 WL 3118415, at *8

(N.D. Ala. May 12, 2020). The Eleventh Circuit has also acknowledged that the 3:1 ratio is a "guidepost" that can be exceeded where a plaintiff suffers little economic harm or is awarded only nominal damages because "[i]n such cases, adherence to a strict compensatory-to-punitive test would undermine the imposition of punitive damages as an exercise of the federal and state governments' authority to 'punish[ ] unlawful conduct and deter[ ] its repetition.'" *Davis v. White*, 2024 WL 3067179, at *8 (11th Cir. June 20, 2024) (quoting *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 568 (1996)). For example, the Alabama Supreme Court has affirmed the following punitive damages verdicts:

- In *Shiv-Ram, Inc. v. McCaleb*, 892 So. 2d 299 (Ala. 2003), the Court affirmed a $500,000 punitive damages award where the plaintiff was awarded $176,572.82 in compensatory damages, a 2.8:1 ratio, where a motel guest was injured by a piece of metal extending from a bed frame.

- In *Sparks v. Cash Am. Int'l, Inc.*, 789 So. 2d 231 (Ala. 2000), the Court affirmed the judgment on condition that the plaintiff accept remittitur of the compensatory and punitive damages to a 3:1 ratio of $225,000 in punitive damages and $75,000 in compensatory damages in dispute between pawnshop employee and pawnshop corporation over breach of contract and fraud allegations.

- In *Patel v. Patel*, 708 So. 2d 159 (Ala. 1998), the Court affirmed punitive damages of $225,000 where the ratio of punitive to compensatory damages was approximately 2.6:1 in case where nephew and his wife sued uncle for breach of contract and fraud relating to representations the uncle made regarding the profitability of a hotel the nephew and his wife purchased from uncle.

13. In sum, White's compensatory and punitive damages – and the sum for which Progressive would have to indemnify the insured in the event of liability – could easily exceed $75,000 exclusive of interest and costs.

14. Moreover, the carrier's defense costs may be considered in an insurance coverage declaratory judgment. *Tuskegee Univ. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 2018 WL 3873584, at *2 (M.D. Ala. Aug. 15, 2018) (concluding that "the *potential* amount of indemnification may be combined with the cost to defend in determining the amount in controversy" between an insurer and an insured). Progressive reasonably estimates defense costs and expenses could exceed $50,000 through a hearing on class certification, and exponentially more, if a class were certified. Therefore, the amount in controversy is satisfied.

15. Moreover, the Seventh Circuit has held that anti-aggregation principles do not apply in federal declaratory judgment actions between an insurer and its insured on coverage. *See Meridian Sec. Ins. Co. v. Sadowski*, 441 F.3d 536, 539 (7th Cir. 2006). The Seventh Circuit's decision in *Sadowski* was favorably commented upon in *Indiana Lumbermens Mut. Ins. Co. v. Lumber One Wood Preserving, LLC*, 2014 WL 4681773, at *3 (N.D. Ala. Sept. 16, 2014), in which the Northern District of Alabama observed that the *Sadowski* opinion "might provide useful guidance if the issue before the court was whether jurisdiction existed over [the insurer's] declaratory judgment action . . . between an insurer and its insured." *Id*. That means

that in determining the amount in controversy, the Court may consider the amount of the putative class members' claims. Thus, this is persuasive authority that the aggregate of the putative class claims can be used to establish the amount in controversy between Progressive and PES in an insurance coverage action.

16.     As noted above, in addition to his damages, White seeks relief for a class of other putative class members since 2018. *See* Ex. A. In another case filed in the Jefferson County Circuit Court asserting similar claims, *Ann Marie Freeman v. Parking Enforcement Systems, Inc., et al.*, Case No. 1-CV-2023-901479, the plaintiff alleged that PES towed more than 50 vehicles a month under similar circumstances. *See Freeman* Complaint, attached hereto as Exhibit B.

17.     At a rate of 50 vehicles a month since 2018 (the class period), PES would have allegedly towed 3,600 vehicles under similar circumstances. At $166.40 in monetary damages per tow, the potential liability could range in the hundreds of thousands of dollars, and even exceed $500,000 in wrongful parking fees alone.

18.     The potential liability grows exponentially when mental anguish and punitive damages awards are included. Especially as the stress of being stranded without a vehicle is compounded for out-of-town visitors to downtown Birmingham.

19.     However, even modest awards to each class member could add up to a substantial figure above $75,000.

20. The costs of Progressive defending and indemnifying PES thus clearly satisfies the jurisdictional threshold.

21. This Court also has supplemental jurisdiction over White because his claims are so related to the claims between Progressive and PES that they form part of the same case or controversy.

## COVERAGE ISSUES

22. The Progressive policy issued to PES is policy number 07896686-012 (the "Policy"). The policy only covers an "accident" resulting from use of an "insured auto" that causes "bodily injury" or "property damage." The insuring clause provides:

> **PART I—LIABILITY TO OTHERS**
>
> The first paragraph in Part I—Liability To Others is deleted and replaced by the following:
>
> Subject to the limits of liability, if **you** pay the premium for liability coverage, **we** will pay:
> 1. damages, OTHER THAN PUNITIVE OR EXEMPLARY DAMAGES, for **bodily injury**, **property damage**, and **covered pollution costs or expense**; and
> 2. punitive damages due for wrongful death;
>
> for which an **insured** becomes legally responsible because of an **accident** arising out of the ownership, maintenance or use of an **insured auto**. However, **we** will only pay for the **covered pollution cost or expense** if the same **accident** also caused **bodily injury** or **property damage** to which this insurance applies.

23. The Policy contains the following definitions:

"**Accident**" means a sudden, unexpected and unintended event, or a continuous or repeated exposure to that event, that causes **bodily injury** or **property damage**.

"**Loss**" means sudden, direct and accidental loss or damage.

8

24. The facts alleged against PES are deliberate and purposeful acts, not a sudden, unexpected, or unintended event. These facts do not constitute an "accident" within the policy period.

25. The Policy defines "property damage" as: "15. **'Property damage'** means physical damage to, destruction of, or loss of use of, tangible property." Economic or monetary loss are not "property damage." The counts for equitable or injunctive relief do not allege "property damage."

26. The Policy also contains the following exclusions:

**EXCLUSIONS—PLEASE READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EXCLUSION APPLIES, COVERAGE FOR AN ACCIDENT OR LOSS WILL NOT BE AFFORDED UNDER THIS PART I—LIABILITY TO OTHERS.**

Coverage under this Part I, including **our** duty to defend, does not apply to:

1. **Expected or Intended Injury**
   **Bodily injury** or **property damage** either expected by or caused intentionally by or at the direction of any **insured**.

7. **Care, Custody or Control**
   **Property damage** to, towing or removal expense for, or **covered pollution cost or expense** involving, any property owned by, rented to, being transported by, used by, or in the care, custody or control of any **insured**, including any motor vehicle operated or being towed. But this exclusion does not apply to liability assumed under a sidetrack agreement.

27. The Complaint alleges PES acted volitionally and could expect or intend to cause harm by its actions, thus triggering exclusion 1.

28. PES taking possession of the cars by towing them and keeping them in a lot triggers the care, custody or control exclusion.

9

29. The Policy includes a Garage Operations Physical Damage Legal Liability Coverage Endorsement, which provides coverage for on-hook towing and garagekeepers storage liability.

30. The on-hook towing provision covers property damage for loss to towed property. The Complaint does not allege a sudden, direct, and accidental loss or damage to the towed vehicles. Therefore, the Garage Operations Physical Damage Legal Liability Coverage is not triggered, and no coverage is afforded.

31. The garagekeepers storage liability provision covers property damage for loss to a customer's auto or customer's auto equipment left in the insured's care while the insured is attending, servicing, repairing, parking, or storing it in its garage operations under comprehensive coverage or collision coverage.

32. "Customer's auto" is defined as "a customer's land motor vehicle, **trailer**, or **watercraft**, including a **customer's auto** left with **you** for service, repair, storage, or safekeeping. Customers include **your employees** and their **relatives** who pay for services performed."

33. As discussed above, there was no "loss." Additionally, the towed vehicles were not "customer's autos." The garagekeepers storage liability provision thus is not triggered, and no coverage is afforded.

34. The Garage Operations Physical Damage Legal Liability Coverage Endorsement also includes an exclusion for "**Loss** due to theft or conversion caused

10

in any way by **you** or **your** employees, partners, members, directors, or shareholders."

35. Thus, even if there were a loss, if PES's towing was a theft or conversion, there is no coverage.

36. The Policy also includes a Commercial General Liability Endorsement, which covers bodily injury and property damage when there is an "**occurrence**" within the policy period.

37. The endorsement defines "**occurrence**" as "an **accident**, happening or event, including continuous or repeated exposure to substantially the same general harmful conditions." As discussed above, the Policy defines "**accident**" as "a sudden, unexpected and unintended event, or a continuous or repeated exposure to that event, that causes **bodily injury** or **property damage**." For the reasons set forth above, no accident or occurrence is alleged and, therefore, coverage under this endorsement is not triggered.

38. Additionally, the Commercial General Liability Endorsement includes an exclusion for expected or intended injuries from the standpoint of the insured. Thus, if PES wrongfully towing a car from a parking lot would cause loss of use and/or mental distress, that would be intended or expected in the very act of towing the car. Therefore, this exclusion would apply to bar any coverage to PES for its actions in towing White's and the putative class members' cars.

39. The Commercial General Liability Endorsement also excludes property damage arising out of use of an auto. PES's towing of vehicles by its truck was inherently use of an automobile. Therefore, White's allegations fall within this exclusion, and no coverage is triggered.

40. Further, the Commercial General Liability Endorsement contains a care, custody, or control exclusion. Because PES exercised exclusive dominion over the vehicles as it towed them from parking lots to its storage facilities and would not release the vehicles until the owners paid the fees and signed the electronic documents, the vehicles were in PES's care, custody, and/or control. This exclusion also applies to bar coverage to PES.

These provisions and exclusions apply to exclude coverage under the commercial policy for PES for the allegations in the underlying suit.

WHEREFORE, Progressive seeks a declaration that:

1. No coverage exists under the commercial policy for the underlying suit;

2. Progressive has no duty to defend PES in the underlying case, and Progressive may withdraw its reservation of rights defense;

3. Progressive has no duty to indemnify PES for any judgment or settlement of the underlying case; and

4. Such other and further relief to which Progressive is entitled.

Respectfully submitted this the 4th day of October, 2024.

/s/ Joseph L. Cowan, II
JOSEPH L. COWAN, II
(asb-3620-a61j)
J. MARK HART
(ASB-5059-A61J)
KATHERINE E.W. MANNING
(ASB-3893-D67V)
*Attorneys for Plaintiff Progressive Specialty Insurance Co.*

**OF COUNSEL:**
HAND ARENDALL HARRISON SALE LLC
1801 5th Avenue North, Suite 400
Birmingham, Alabama 35203
Telephone: (205) 324-4400
Facsimile: (205) 322-1163
Email: jcowan@handfirm.com
 mhart@handfirm.com
 kmanning@handfirm.com

**DEFENDANTS TO BE SERVED VIA CERTIFIED MAIL AS FOLLOWS**:

Parking Enforcement Systems, Inc.
c/o Christopher Andrew Mayer
2011 Oak Lane
Birmingham, Alabama 35226

Terry White
292 Huntington Parc Road
Birmingham, Alabama 35226

/s/ Joseph L. Cowan, II
OF COUNSEL